## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **TIM AND ROBYN PRENDERGAST,** | § | |
| **as next of friends of L.P.** | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO. <u>4:18-cv-0020</u>** |
| | § | |
| **WYLIE INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |
| **Defendant.** | § | |
| | § | |

## <u>FIRST ORIGINAL COMPLAINT</u>

**NOW COMES** L.P., by his next of friends and parents, Tim and Robyn Prendergast, (herein "Plaintiffs" or "L.P.") and files this *First Original Complaint* alleging that the Wylie Independent School District (hereinafter referred to as "WISD" or "School District"), violated Plaintiffs various rights as more specifically pled herein. Plaintiffs reserve the right to re-plead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof, Plaintiffs would respectfully show this tribunal the following:

## I. <u>BRIEF INTRODUCTION TO THE CASE</u>

1. L.P. is a victim of bullying and harassment based upon race, disability, gender, and perceived sexual identity. The School District is aware of this and in many events, has been a witness to physical, mental, emotional, and psychological torment and has done little or nothing about it. The extent of the School District's indifference has now made the School District complicit.

2. Persecution of students for race, disability, gender, and sexual identity, is all too well known in society and a message must be sent that it is not to be tolerated. School Districts are on the front lines and it is not only incumbent upon them to protect those who need protection, but have a legal duty to protect the student and to lead by example,

molding our nation's youth into future leaders and caring adults.

3.      Victims of bullying and harassment are unable to fully engage in their environment and are deprived of the most important factor in becoming successful and independent adults: a good education. Victims suffer through years of abuse and this may lead to a range of afflictions including suicide and violent opposition to the perpetrators, as the victim attempts to defend themselves and right the perceived wrongs.  This unending cycle will have consequences for many who come into contact with these victims for years to come and the importance of handling the bullying and harassment as soon as it occurs cannot be overstated.

4.      More unfortunately because of the hostile educational environment produced by the acts and omissions of School District officials, he experienced emotional distress and treatment.

5.      For L.P. and his family there is nothing more sad than suffering at the hands of teachers and educational professionals, people who are supposed to help kids not intentionally hurt them. His family feels compelled to tell his story in hopes of a healing effect for both the Student and his family members. Having L.P.'s story heard by a Judge provides the empowering fulfillment of finality the family seeks to move forward while also providing guidance for future generations of special education students, which is also important to the family.

## II.  JURISDICTION

6.      L.P. is a citizen of the State of Texas, and was at all pertinent times a student in the Wylie Independent School District (WISD).

7.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§1331 and 1343 because the matters in controversy arise under the United States Constitution and laws of

the United States, including the Rehabilitation Act of 1973, the Americans With Disabilities Act, Title IX, and the federal regulations pursuant to the above, issued thereunder.

8.    Furthermore, this Court has jurisdiction to award attorney fees and costs to the Plaintiff under the Americans With Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and 42 U.S.C. §1983, pursuant to 42 U.S.C. § 2000d *et seq.* and 42 U.S.C. §1988.

## III.  VENUE

9.    Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs claims occurred in the Eastern District of Texas, Sherman Division.

## IV.  PARTIES

10.    L.P. lives in Texas and was a student at the Wylie Independent School District at the time of the incidents described herein. L.P. is a person with a disability for the purposes of this case. He is the biological son of Tim and Robyn Prendergast, and currently live at 4226 Meadowview Lane, Sachse, TX, 75048 in Collin County.

11.    Defendant Wyatt Independent School District is a state agency responsible for oversight, rule making, compliance with state and federal law, and control of the public primary and secondary schools in Wylie, Collin County, Texas and receives federal funding. They may be served through their Superintendent, David Vinson, Ph.D. at 2550 W. FM 544, Wylie, TX, 75098. Plaintiffs reasonably believe they will be represented by and through their Counsel, Dean Micknal, at Leasor Crass, P.C., at 302 W. Broad St., Mansfield, TX, 76063 in Collin County.

## V. STATEMENT OF FACTS

### A.    ABOUT L.P.

12.    L.P. was born in 2001. During the time period for the basis of this complaint he was a student enrolled in Wylie High School in WISD.

13.    L.P. started attending Wylie High School ("Wylie") in his 9th grade year in the Fall semester of 2016.

14.    L.P. was diagnosed on the autism spectrum with Pervasive Developmental Disorder ("PDD") in the 4th grade.

15.    Prior to attending Wylie High School, L.P. attended smaller charter schools during his 5th through 8th grade years. In March of 2016, the spring prior to L.P. entering High school, L.P. and his parents took a tour of Wylie High school where he was to receive special education services based upon having Autism, a learning disability, and a Speech Impairment.

16.    The Prendergasts expressed concerns that L.P. could potentially be exposed to bullying at such a large school where L.P. had no friends. Principal Virdie Montgomery assured Mr. and Mrs. Prendergast that Wylie High school has a zero tolerance policy when it came to bullying and offenders would be sent to Alternative Schools. Unfortunately this was proven to not be the case.

B.    HISTORICAL BACKGROUND OF SCHOOL DISTRICT LIABILITY

1.    Title IX Of The Educational Acts of 1972

17.    The Educational Acts of 1972 passed through Congress as Public Law No. 92-318, 86 Stat. 235 (June 23, 1972) and codified at 20 U.S.C. sections 1681 through 1688. It is commonly known as "Title IX" and states (in part) that:

"No person in the United States shall, on the basis of gender, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."

It is intended to remedy the effects of discrimination based upon sex, gender or gender

stereotypes. Moreover it is to assure that a student is not a victim of bullying, harassment, sexual harassment, assault or sexual assault because of their membership in this protected class. The Department of Education also promulgated rules to help implement Congress' intent at 34 C.F.R. §106.1, which became effective as early as July 1, 1975.[1]

18.   From the inception of Title IX the United States Department of Education ("DOE") in their *Office for Civil Rights* (OCR) issued policy guidance on discriminatory harassment. They did so on discrimination based upon race (*see* 59 Fed. Reg. 11448 (Mar. 10, 1994) and later regarding harassment based upon sex ["Title IX"] (*see* 62 Fed. Reg. 12034 [Mar. 13, 1997]). These policies made clear that school personnel must understand their legal obligations to address harassment based upon sex, gender and gender stereotypes and further, that they were in the best position to recognize and prevent the harassment, to lessen the harm to students if, despite their best efforts, harassment continued to occur and importantly, remedy the effects of the harassment.

2.      Section 504 Of The Rehabilitation Act of 1973

19.   The Rehabilitation Act of 1973, Public Law 93–112, 87 Stat. 355, enacted September 26, 1973), and is codified at 29 U.S.C. §701 et seq. It replaced the Vocational Rehabilitation Act of 1973, to extend and revise the authorization of grants to States for vocational rehabilitation services, with special emphasis on services to those with the most severe

---

[1].   They include but are not limited to 34 CFR ¶106.8(a) [adopting responsible person]; 106.8(b) [adopting grievance procedure]; 106.9 [must disseminate policy and make continuing steps to do so under the circumstances]; 106.31(b) [forbidding discriminating on the basis of sex by providing  different services or failing (or denying) to provide services based upon sex or gender]; 106.31(d) [shall develop and implement procedures to assure non-discrimination]; 106.33 [must develop comparable facilities and services]; 106.34 [must provide equal access to classes and school]; 106.36 [can't discriminate in counseling services]; 06.37(a)(2) [cannot provide financial assistance to entity that discriminates based upon sex or gender]; 106.38 [making employment available cannot discriminate based upon sex or gender]; 106.51(a)(3)[ [1998].

disabilities. It established special responsibilities with the Secretary of Health, Education, and Welfare for coordination of all programs with respect to individuals with disabilities within that Department. Regulations were promulgated so as to assure schools followed Section 504 requirements.[2]

3.      The Americans With Disabilities Act of 1990

20.     The *Americans with Disabilities Act of 1990* (ADA) was enacted by the U.S. Congress in 1990 and was signed into law on July 26, 1990 by then President George H. W. Bush. The ADA was intended as a wide-ranging civil rights law that prohibited, under certain circumstances, discrimination based on disability in all public environs. It afforded persons with a disability and victims of discrimination based upon disability, the same protections afforded Americans, as noted in the *Civil Rights Act of 1964*, which made discrimination based on race, religion, sex, national origin illegal.  Disability was defined by the ADA as "a physical or mental impairment that substantially limits a major life activity."  Importantly, any determination of whether any particular condition is considered a disability, or if there is discrimination based upon disability, is made on a case by case basis. The Department of Justice promulgated regulations related to the

---

[2]. 34 C.F.R. §104.1 [purpose- discrimination based upon disability prohibited]; 104.2 [applies to entities receiving federal monies]; 104.3 [defines disability]; 104.4 [handicapped person may not be excluded from or denied benefits, or subjected to discrimination based upon disability] (b)(1) [discriminatory actions prohibited]; 104.7 [must designate 504 Coordinator and inform person of grievance procedures]; 104.8 [provide continuing notice of persons rights and remedies]; 104.32 [notify parents of school district's duties]; 104.33(b) [must provide educational services to the same extent as non-disabled peers]; [ 104.34 [student must be educated in "least restrictive environment" and in "most inclusive manner"; must provide comparable services to person with disability as compared to person without disability]; 104.36 [must provide procedural safeguards including right to an impartial hearing]; 104.61 [procedural provisions of Title VI of Civil Rights Acts of 1964 §100.6-100.10, part 101 are applicable to Section 504].

ADA.[3]

4.    Guidelines From The Office Of Civil Rights

21.    In 1994 the DOE *Office of Civil Rights* ("OCR") produced policy guidance entitled *Racial Incidents and Harassment Against Students At Educational Institutions, Investigative Guidance*. 59 Fed. Reg 47 (March 10, 1994). It set the professional standards of care for investigating and addressing harassment, whether in general or when based upon sex or gender, religion or nationality, or disability.

22.    On March 13, 1997, the OCR, after public hearings, produced *Sexual Harassment Guidance* delineated at 62 Fed. Reg. 12034. It again noted that the relevant Title IX Standards were patterned after the anti-discrimination statutes under Title VII of the Civil Rights Act of 1964 and that District may be liable for teacher upon student sexual harassment as it does, as a matter of course, create a hostile educational environment for the student, fails to prevent reoccurrence of any harassment and fails to *remedy the effects of the harassment*.

23.    In 1998 the Supreme Court heard the case of <u>Gebser v. Lago Vista Independent School District</u>, 524 U.S. 274 (1998), which dealt with analysis that must be undertaken when determining whether or not a school district may be liable for teacher upon student sexual

---

[3].   35 C.F.R. §101 [purpose - discrimination based upon disability prohibited]; 102 [applies to all services, activities and programs provided by public entities]; 103 [shall not be construed to apply a lesser standard than the standards applied under Title V of the Rehabilitation Act of 1973]; 106 [notice to interested persons to apprise such persons of the protections against discrimination]; 107 [designation of responsible employee to coordinate compliance efforts];  108 [defines disability]; 130(a) [disabled person may not be excluded from or denied benefits], (b) [discriminatory actions prohibited], (d) [administer services, programs and activities in an integrated setting], (g) [no denial of equal services, programs or activities], and (h) [ensure any safety requirements are based on actual risks]; 149 [individuals with disabilities, shall not be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity].

harassment, including the requirement that the necessary school official be on notice of the sexual contact.

24.    In 2000 the OCR and the *Office of Special Education* ("OSERS") also with the DOE sent out a *Memorandum* regarding harassment based upon disability (its also been known as the "Dear Colleague Letter"). It was sent to school boards and districts throughout the country. It discusses among other things the profound effects of bullying and harassment on a student with a disability, the laws and rules that apply (Title IX, Section 504, the ADA) and how such bullying and harassment, unrequited, effects a students equal opportunity under the laws noted therein.

25.    The letter also addresses the duty to respond to bullying and harassment and how to prevent it. The number one item was to create a campus environment by first, training staff and by providing related supervision, so that they and the entire educational community become and sensitive to disability related concerns regarding bullying and harassment. Among other things it noted the importance of publicizing the issue, of non-toleration of harassment based upon disability, of training to students, of counseling to both the victim and perpetrator, of ongoing monitoring and follow up on incidents and ongoing assessment of the school climate and policies and practices to assure effectiveness. Moreover, it reiterated the importance of assuring the parents received notice of all their procedural safeguards, including notice of who the Section 504 Coordinator was and the grievance procedures available, including those at the school level, state level and federal level.

26.    Since that time the OCR has promulgated a number of guidelines on how a school district should respond to bullying, harassment and assault, whether it be student upon student interactions or teacher upon student interactions and whether or not based upon disability

(Section 504 and the ADA); sex or gender or gender stereotypes (Title IX) or race, religion or nationality (Title VI). They all reiterate the above noted duties to satisfy procedural guidelines (notice of who is the correct staff person to address concerns, complete an investigation in a timely and complete manner, give copies of all investigatory findings and right to appeal).

27.    They also all reiterate substantive duties to remedy the effects of the alleged harassment, regardless of a finding, including but not limited to required a response tailored to the needs of the student and situation, including providing psychological services to the student, providing or paying for counseling services for the student, placing the students in different classes or environments or removing the perpetrator from the hostile environment, providing a one-to-one aide, providing social skills services; and close monitoring of the victim.

     5.    The State Of Texas

28.    In 2008 the Texas Association of School Board's (TASB") sent out a letter to all School District's to address all the items noted above. It noted the duty to address bullying and harassment whether it be based upon race, religion, nationality; disability; sex, gender or gender stereotypes and none of the above. It re-urged the duty to have effective policies and procedures to address these issue. It incorporated by reference a directive from the U.S. Department of Health on "Best Practices" in prevention, including and especially the duty of the School Board to address the social environment of the school, complete a bullying assessment and  train staff specifically in prevention. Since that time the TASB has provided numerous updates on the issue as the case law has developed, federal guidelines get updated and Texas Law changes.

29.    These federal guidelines, directives and professional standards of care, over the course of

time have become integrated into Texas law. First, there were increased penalties in the Juvenile Justice system for students who assaulted, bullied and harassed other students. In addition, the Texas Education Agency ("TEA") and their various local service centers working under TEA's purview developed and disseminated a significant amount of support material for school boards as to how to best prevent bullying and harassment in general, and bullying and harassment based upon disability, sex and gender in particular.

6.      The Wylie Independent School District

30.    The Wylie Independent School District has long had and re-authorized policies and procedures related to *Student Welfare* and keeping students free from Discrimination, Harassment & Retaliation, that address among other things, including teacher upon student sexual harassment and assault.

31.    It sets out definitions of sexual harassment, information about reporting allegations of bullying and harassment, and their own investigatory procedures. It requires all allegations of bullying, harassment or assault based upon sex or gender or upon a student with a disability by a teacher, to be directed to the School District's Title IX or Section 504 Coordinator, and the family be given that person's contact information and notice of their procedural rights. A District's investigation needed to be completed in a timely manner, usually less than 10 days, that a written report should be developed and interim action taken, as appropriate. The report must address whether or not prohibited contact occurred and must be filed with the relevant School District Official with a copy given to the family. If a student is not satisfied with the outcome of the investigation, they have the right to appeal the decision through the District's grievance procedure, with the TEA or even with the OCR  with the U.S. Department of Education.

32.    The School Board Policies also note a non-exhaustive list of potential corrective actions

based upon relevant caselaw, OCR and TASB Guidelines noted above. They include a training program for the victim and perpetrators, a comprehensive education program for the school community and counseling to the victim and perpetrators(s). Again, there needed to be a system in place to follow-up and determine if new incidents had occurred and the effectiveness of those provided. There is also discussion of increasing staff monitoring and assessment of the problem.

C.    INCIDENT AT THE WYLIE INDEPENDENT SCHOOL DISTRICT

33.    Upon enrolling at Wylie High School and on August 26, 2016, the school met with the family, but parental concerns about bullying and harassment were not addressed. L.P. is a bright student, but does have trouble in classes that require high levels of memorization or require high levels of processing speed such as Spanish and Math class.

34.    In addition to his general education courses, L.P. was also enrolled in some "resource" classes. Further, it was identified that L.P. had trouble asking teachers for help and it was noted he needed help him in learning to seek assistance from teachers. This created a duty for the teachers to be more proactive and pay attention to see if L.P. needed help.

35.    L.P. was constantly bullied and harassed in Biology class every day. His desk was five to eight feet directly in front of the teacher, Ms. Renee Maness. The student, C.P., who sat next to L.P. would constantly taunt him, poke him with things, knock his backpack out of his hands, and call him names, despite L.P. asking him to stop. He would push and hit L.P., and also push L.P.'s chair all the way across the room so L.P. had to carry it back, all in front of Ms. Maness. Ms. Maness observed the bullying and harassment, yet never did anything to stop this behavior, or report it pursuant to operative law.

36.    On or around October 20, 2016, L.P. asked Ms. Maness if he could move his seat away from C.P.. She permitted L.P. to move, but as L.P. moved, C.P. said loud enough for the

class to hear, "I don't like [L.P.]- he is annoying." Ms. Maness did not report the bullying and harassment L.P. experienced in that class, nor did she do anything to stop it pursuant to operative law.

37.    On or about November 15, 2016, was L.P.'s first day to ride the bus to school.  A student, B.M., on the bus who knew L.P. was in resource classes told L.P. in front of the other students, "You're autistic, you're gay, and you can't sit here." From that time until he left the school district, L.P. sat behind the bus driver ostracized and alone.

38.    One day in December 2016, L.P. was walking in the hallway with a friend, M.P., who stopped to greet a former teacher. The teacher greeted M.P. and then proceeded to derogatorily comment on L.P.'s height, saying "you don't look old enough to be in high school," with an inference that L.P. was to small to be in high school.

39.    On or about December 16, 2016, the last day before winter break, Student D started pouring his Dr. Pepper in L.P.'s hair in the hallway, but L.P. knocked the can away.

C.    JANUARY 2017 AND THE INCIDENT IN QUESTION

40.    On or about January 2, 2017, was the first day of class after the winter break. L.P.'s math teacher, Mr. Reggie Bibb, mocked L.P.'s recent haircut and said "What's up with the platinum hair? It's not the 90's." This comment prompted students in the class to yell out offensive comments at L.P., including C.O. who yelled out "faggot" in front of the teacher and the entire class, with the class erupting into laughter. Not surprisingly, the teacher failed to stop the harassment or to report it.

41.    From this point on, Mr. Bibb frequently made disparaging remarks about L.P.'s recent haircut and said "when your roots come in you should cut it." This behavior by the teacher set the tone for the rest of the class. Student D would torment L.P. by constantly knocking his backpack over and even stabbing him with a pencil, to which the teacher

replied "be quiet stay focused." The teacher failed to report this incident as well.

42.    When Frank Mulligan, the Spanish class teacher, learned of L.P.'s ARD/IEP, he assigned the student sitting next to him, B.P., as L.P.'s "helper."  This occurred early in the school year. B.P. was to assist L.P. in classroom tasks. No other student had a helper and this led to students calling L.P. dumb with everyone in the class laughing and making fun of L.P. as well. Unfortunately, that was just the beginning. L.P.'s helper was nothing more than a bully who quickly nicknamed L.P. "bitch boy." L.P. told Coach Milligan of this treatment and the Coach's response was "too bad."

43.    Mulligan had L.P.'s helper grade his in-class work and the helper would grade his work in an unfair manner. Then, Mulligan would have the students read each other's grades out loud to the class. This led to further humiliation for L.P. when his "helper" incorrectly graded his assignments and shared his lower than average grades with the class. Other students in the class taunted L.P. by calling him dumb and other similar insults, and laughing at him.  Even though Mulligan observed the harassment he failed to stop it, or report it.

44.    On or about January 5, 2017, L.P. had to enroll in a resource class, forcing him to change into a different period of Mulligan's Spanish class. Coach Mulligan told L.P., "you will fail – that class is my worst class – it's out of control." Upon learning of this statement by Mulligan, L.P.'s father called the school counselor, Lori Chapman, to notify her and she stated he should not have said that.

45.    On or about January 9, 2017,  L.P. began attending his new Spanish class. L.P.'s hand started to bleed after stabbed with a rusty fork by the student sitting next to him, C.P. L.P. told Mulligan what happened and his response was "go to the nurse or something; I

told you this was my worst class." The student who stabbed L.P. in the hand was not punished. The harassment was not reported or investigated either.

46.     On or about January 12, 2017, L.P. became fed up with the taunts of the student who had stabbed him, so he picked up his books and moved to a different desk. Nevertheless, Mulligan promptly told L.P. he had an assigned seat and made him move back to the original desk.

47.     L.P. was regularly harassed in the halls where teachers were always monitoring during class changes. Students would knock L.P.'s drinks out of his hand so frequently that L.P. eventually had to bring a cup with a screw on lid to prevent his drinks from spilling. L.P. was constantly shoved, kicked, bullied, and verbally harassed in the halls by various students, such as B.Y. and A.M. B.Y. assaulted L.P. almost on a daily basis with slaps, punches, throwing his backpack, name calling and kicking. L.O. notes that eachers were always present in the hallways talking with students or drinking coffee, but none of them ever stepped in to prevent this from happening or disciplined any student who engaged in this behavior even though teachers were always present to monitor student behavior. Nor was the bullying or harassment ever reported.

48.     On or about January 26, 2017, proved to be the last straw. L.P. had to remain a few minutes behind in his last class of the day. Upon entering the empty hallway, L.P. was surrounded by five African American male students that L.P. did not know. By this point, L.P. was accustomed to ignoring the harassment and bullying in the halls that happened on a daily basis. This time, L.P. was not able to simply ignore the abuse. One of the five students, C.B., grabbed L.P. and viciously threw him to the floor. If not for L.P.'s backpack, he would have suffered severe head trauma. Upon being thrown to the floor,

C.B. began to punch and kick L.P., and called L.P. "Bitch ass nigger." Luckily, a janitor came to L.P.'s aid and took him to the office. Even with all this information, no one in the administrative staff reported the bullying and harassment either.

D.    POST INCIDENT

49.    Of the five assailants, only the student who threw L.P. to the ground and the student who videotaped the incident was disciplined at all. The primary assailant received one month of suspension. The other students started a rumor that L.P. had tried to kiss them and that is why they treated him so violently. This narrative is clearly contradicted by the video. However, it has turned the perpetrator into a local hero with a slogan of *#Free[C]* widely used on social media and written around the school.

50.    Upon further searching by L.P.'s parents, a clear pattern of violence at Wylie High school is evident. The students responsible for the attack on January 26th have over 60 fights posted on social media that are readily accessible to anyone who wants to see. Many of these fights take place on school grounds and are evidence of a culture of violence and intimidation that the school cannot claim to be unaware of.

51.    L.P. and his parents do not know who the other attackers are and did not feel safe at the school or out in the community. The primary attacker from January 26th has a brother that is in L.P.'s first period class. The rumors that have been spread throughout the school about L.P. have taken root and his reputation is forever affected, yet the school administrators have told L.P.'s father to send him back to school and this "will all blow over". Even with this information the School District failed to investigate the allegations of bullying and harassment required by law.

52.    L.P. has had multiple treatments for whiplash and has exhibited severe emotional affects

from the incidents at school. The WISD has acted in a way that has prevented L.P. any chance for an education in a non-hostile environment.

53.  L.P. has been a student at WISD and has made good grades despite the persistent bullying, harassment, and learning disabilities. L.P. has exhibited signs of post-traumatic stress disorder and lives in constant fear of repercussions from the incidents that are the subject of this complaint.  Ultimately, L.P.'s parents decided they had no choice but to remove L.P. from Wylie High School.

54.  During this entire period, the School District failed to investigate any of the allegations that L.P. was a victim of bullying or harassment, whether it be pursuant to Section 504 standards or Title IX standards or other relevant standard.

55.  During this entire period the School District failed to tell Plaintiffs of their rights under School Board policies and procedures regarding bullying and harassment.

56.  During this entire period the School District failed to inform Plaintiffs of their right to file a  grievance with the School Board.

57.  During this entire period the School District failed to inform Plaintiffs of their right to file a complaint with the Texas Education Agency.

58.  During this entire period the School District failed to inform Plaintiffs of their right to file a complaint with the Office of Civil Rights.

59.  The School District failed to convene a meeting to address the bullying and harassment.

60.  The School District failed to provide any of the remedies required under the School Board's own policies and procedures including but not limited to providing:

    a.     a psychological  assessment;

    b.     school-based counseling services;

    c.      an aide or shadow to observe the Student at the  school; or

    d.      social  skills training.

61.    The School District failed to address the impact of the bullying and harassment on the student.

62.    The School District was clearly indifferent to the rights of L.P. to be educated in a safe and non-hostile educational environment.

## VI.   CLAIMS RELATED TO THE REHABILITATION ACT OF 1973

63.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

64.    The WISD receives federal funds and thus follow the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

65.    The implementing regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's unique and individualized needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

66.    Plaintiffs further assert that because the School District has failed to provide L.P. a safe and non-hostile educational environment as compared to a non-disabled student, such failures as noted above, have together and separately, contributed to violating his rights pursuant to Section 504, and the federal rules and regulations promulgated pursuant thereto.

67.   Moreover, and likewise in addition and in the alternative, the failures denoted herein by the School District were a gross deviation from professional standards of care.

68.   Lastly, the acts and omissions of the School District violate the regulations under Section 504.

### VII.   CLAIMS RELATED TO THE AMERICANS WITH DISABILITIES ACT

69.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

70.   The facts as previously described demonstrate violation of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq. ("ADA").

71.   L. P. is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2) with his disabilities affecting his major life activities, including and especially his ability to attend public school, all as noted above.

72.   The WISD is deemed a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

73.   The WISD provides a facility whose operation constitutes a program and services for ADA purposes.

74.   L.P. was a victim of discrimination based upon disability and race.

75.   The WISD refused to reasonably accommodate L.P.'s disabilities and modify their services in violation of Title II of the ADA by not having a safe environment and non-hostile educational environment for him.

76.   The acts and omissions of the School District specifically undermine and interfere with his rights to privacy and bodily integrity, for which the School District is liable to him pursuant to the ADA.

77.   The acts and omissions of the School District Defendant violate L.P.'s rights under the ADA by not keeping him as safe as his non-disabled peers.

78.   The acts and omissions of the School District Defendant injured L.P.

## VIII. CLAIMS RELATED TO TITLE IX

79.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

80.   Title IX specifically notes the standards of liability for a public entity in regard to the Title IX claim. The claimant must be a member of a protected class; must be bullied, harassed pr assaulted based upon membership in that class; the Defendant entity must be on notice as to the allegations; be deliberately indifferent to those allegations and the victim must have experienced a deprivation of educational opportunities and/or other damages, L.P. easily satisfies all of the threshold requirements stated above.

81.   Plaintiffs further contend that these failures of the School District to have effective policies, procedures, practices and customs in place to insure L.P. was not a victim of bullying, harassment, or assault based upon gender, or based upon stereotypes based upon gender, and due to such failures violated his rights pursuant to Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 et seq., upon which he now seeks recovery.

82.   L.P. has a private cause of action against the School District for their failure to follow relevant regulations promulgated pursuant to Title IX.

83.   L.P. experienced significant injuries thereby.

## IX.  STATE ACTION

84.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force

and effect as if herein set forth.

85.    The Defendant School District was at all times and in all matters acting under color of federal and state law in regard to the acts and omissions alleged by Plaintiffs.

86.    The Defendant School District was at all times and in all matters receiving federal funds during the period in question and thus have a duty to satisfy the requisites of Title VI, IX, Section 504, the ADA and Section 1983.

## X.   CLAIMS PURSUANT TO 42 U.S.C. §1983

87.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

88.    The acts and omissions of the School District injured L.P.

89.    The acts and omissions of the School District by treating L.P. in a disparate manner as compared to other students similarly situated, thereby violating the *Equal Protection Clause* of the Fourteenth Amendment, for which L.P. seeks recovery pursuant to 42 U.S.C. §1983.

## XI.   UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES & CUSTOMS

90.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, above with the same force and effect as if herein set forth.

91.    The United States Department of Education, by and through their Office of Civil Rights, the Texas Legislature, the Texas Association of School Boards and even the Wylie Independent School District Board in their policies and procedures, have all spoken repeatedly about their concerns students not be bullied and harassed by anyone, even staff, because of their disabilities.

92.    The Wylie Independent School District has a policy, practice, and custom of failing to

investigate allegations of bullying, harassment, and discrimination based upon disability, race, and gender.

93. Notwithstanding these laws, rules, guidelines and policies, it is clear that this School Board has failed to train staff about these concerns and the laws, regulations and directives related thereto.  Such failures rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which L.P. seeks recovery pursuant to 42 U.S.C. §1983.

94. Notwithstanding these laws, rules, guidelines and policies, it is clear that this School Board has failed to supervise staff about these concerns and the laws, regulations and directives related thereto.  Such failures rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which L.P. seeks recovery pursuant to 42 U.S.C. §1983.

95. Based upon the operative facts, such acts and omissions rise to the level violations of the Fourteenth Amendment of the Constitution of the United States, and for which L.P., seeks recovery, also pursuant to 42 U.S.C. §1983.

## XII.  RATIFICATION

96. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

97. WISD ratified the acts, omissions and customs of school district personnel and staff.

98. As a result, WISD is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of L.P.

## XIII.  PROXIMATE CAUSE

99. Plaintiffs incorporate by reference all the above related paragraphs with the same force

and effect as if herein set forth.

100.    Each and every, all and singular of the foregoing acts and omissions, on the part of the School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XIV.  DAMAGES

101.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

102.    As a direct and proximate result of the WISD's conduct, L.P. has suffered injuries and damages, for which he is entitled to recover herein including but not limited to:

    a.      Physical pain in the past;

    b.      Physical pain in the future;

    c.      Loss of educational opportunities in the past;

    d.       Loss of educational opportunities in the future;

    e.      Medical expenses in the past;

    f.      Medical expenses in the future;

    g.      Mental anguish in the past;

    h.      Mental anguish in the future;

    i.      Mental health expenses in the past;

    j.      Mental health expenses in the future;

    k.      Physical impairment in the past; and

    l.      Various out-of-pocket expenses incurred by his family but for the acts and omissions of the School District.

## XV.  ATTORNEY FEES

103.    Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein.

104.    It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgement, Plaintiffs are entitled to an award of attorney fees and costs pursuant to Section 504, the ADA, Title IX, 42 U.S.C. §2000d et seq.,  and 42 U.S.C. §§1983 and 1988.

### XVI.  DEMAND FOR A JURY TRIAL

105.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

### PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against the District in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to Section 504, the ADA, Title IX, 42 U.S.C. §§1983 and 1988, and 42 U.S.C. § 2000d et seq.; together with pre- and post-judgment interest, and court costs expended herein, as well as the equitable issues noted above; and for such other relief as this Court in equity, deems just and proper and for such other relief as the Court may deem just and proper in law or in equity.


Respectfully submitted,

By: /s/ Martin J. Cirkiel____
    Mr. Martin J. Cirkiel, Esq.
    Marty@cirkielaw.com [Email]
    State Bar No. 00783829

Dominique L. Augustus, Esq.
Dominique@cirkielaw.com [Email]
State Bar No. 24105450

Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

Mr. Anthony O'Hanlon, Esq.
Anthony O'Hanlon, P.C.
State Bar No. 15235520
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 947-4302 [Facsimile]
aohanlon@somlaw.net [Email

ATTORNEYS FOR PLAINTIFFS